# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 8, 2002 Session

## MICHAEL BARAL v. GEORGE JOSHUA BOMBARD

### Appeal from the Juvenile Court for Davidson County
### No. 97-09716    Betty Adams-Green, Judge

_____

### No. M2000-02429-COA-R3-JV - Filed June 5, 2002

_____

This appeal arises from a dispute over the custody of Austin Bombard, a minor child, and the termination of George Bombard's parental rights on a finding of abandonment. The trial court dismissed the father's Petition for Custody and granted custody of the child to Jocelyn and Michael Baral, the child's maternal aunt and uncle. Mr. Bombard challenges the termination of his parental rights and the trial court's custody order. We affirm the trial court's termination of the father's parental rights and custody order. Costs of this appeal shall be assessed to the appellant.

### Tenn.R.App.3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

DON R. ASH, S.J., delivered the opinion of the court, in which William B. Cain, J. and Ben H. Cantrell, J., joined.

Andy Allman and Stephanie Hatchett, Nashville, Tennessee, for the appellant, George Bombard.

Phillip Robinson and Christine Carolton, Nashville, Tennessee, for the appellees, Michael and Jocelyn Baral.

# OPINION

## I. Facts

Appellant, George Bombard ("Bombard"), and Tina Marion ("Marion"), are the parents of Austin Bombard, whose date of birth is April 12, 1996. In March of 1996, Valerie Cook, investigator for child protective services of the Tennessee Department of Children's Services (herein after "DCS"), responded to a report that Marion's oldest child, Lawrence Martinez, had a bruise in the shape of a hand on the side of his face. Cook interviewed the child at school and was told Mr. Bombard had struck the child in the face for poor homework. Cook went to the Bombard/Marion residence and confronted the couple regarding the abuse. Bombard admitted he slapped the child. The couple agreed to a safety plan whereby Marion would be responsible for the future corporal punishment of her children and Bombard would not inflict such discipline.

Cook received a second referral regarding Lawrence on August 27, 1996. She examined him at school and observed the child had a swollen nose, bruises extending across the bridge of the nose and under one eye, and bloody scabs on the end of his nose and chin. Allegedly, Bombard punished him by forcing him to the floor and slamming his face into the floor on three occasions. Cook traveled to the Bombard/Marion residence and confronted the couple again. Bombard initially denied any involvement, but later admitted he was trying to discipline the child when the injuries occurred. Cook insisted Bombard immediately vacate the residence, but he refused. Bombard was ultimately removed from the home by DCS approximately one week later as a result of this abusive behavior toward Marion's child. Bombard was subsequently charged with misdemeanor child abuse as a result of Lawrence's injuries. Bombard pled guilty to the charge and received a sentence of eleven months and twenty-nine days suspended, eleven months and twenty-nine days probation, counseling, and to follow the Orders of the Juvenile Court and DCS. The Luton Mental Health Center recommended extensive counseling for Bombard but he only attended four sessions. Bombard was eventually released from probation in spite of his failure to complete the recommended counseling program at the Luton Mental Health Center.

Marion and the children were evicted from the residence at the end of September 1996. The State later filed a Petition alleging Austin Bombard and the other children living in Marion's household were dependent and neglected. An emergency protective order temporarily placing the children in the custody of DCS was entered on August 11, 1997. An Order of Adjudication and Disposition was entered on December 19, 1997 whereby Austin Bombard and Marion's other children were found to be dependent and neglected, and legal custody was to remain with DCS. Austin was placed in foster care and Marion's other children were placed with their biological father. DCS was unable to locate Mr. Bombard at this time. Marion was unable to provide DCS with an address for Bombard. DCS then unsuccessfully attempted to reach Bombard via certified correspondence at the address on record with the Department of Safety. Consequently, Austin was later placed in the temporary care of his maternal aunt and uncle, Appellees Jocelyn and Michael Baral, in May 1998. The Barals requested to adopt the minor child and DCS initiated the process to terminate the parental rights of Marion and Bombard.

Bombard had no contact with Marion or Austin from the end of September 1996 until he was located by DCS through a due diligence search in June 1999. Bombard filed a Petition for Custody on July 13, 1999. A Permanency Plan was developed by DCS, the Guardian *Ad Litem*, and Bombard whereby the father was required to participate in individual counseling to address his temper and abusive conduct and to acknowledge his responsibility for the prior abuse. Bombard was advised failure to comply with the Permanency Plan could result in the termination of his parental rights. Bombard was ordered to begin paying child support at a hearing on November 23, 1999. Bombard then traveled to California later that month to visit his son for the first time since September 1996. Although Bombard's visit with Austin went well, the Barals decided to consult Leslie S. Packard, Ph.D., a clinical psychologist, in anticipation of potential disruption in Austin's environment. Dr. Packard performed an attachment/bonding study with Austin and determined the child had bonded with the Barals, but also concluded Austin suffered from Reactive Attachment Disorder as a result of his history of multiple placements and warned the child may suffer serious emotional harm if removed from the Barals and placed with Bombard. A second psychologist, Dr. Shelia Elizabeth Byrns, confirmed this diagnosis. Dr. Byrns also concluded removal of Austin from the Barals and placement with Bombard would be emotionally devastating for the child and result in serious and substantial harm. The Barals responded by filing a Petition to terminate the father's parental rights, or in the alternative for custody of the minor child, on December 14, 1999, alleging Bombard had abandoned Austin and represented a danger to the child. The trial court suspended Bombard's visitation with Austin pending the trial.

This cause was adjudicated in Davidson County Juvenile Court on August 28 and 29, 2000. The trial court determined Mr. Bombard's petition for custody of his son and the petition by the foster parents to terminate the father's parental rights should be adjudicated in separate orders with findings of fact and conclusions of law. The trial court determined Bombard was not a credible witness, as the proof showed he made no serious efforts to locate Austin, and is unaware of the whereabouts of four other minor children from two separate women, but claims he has "diligently" searched for them also.

The trial court's Custody Order found removal of the minor child from the possession of the Barals and placement of the child with the biological father presented a substantial threat of serious emotional and physical harm to the child and it was in the child's best interests that custody be placed in the Barals. Thus, the trial court dismissed Bombard's petition for custody and awarded custody to the Barals.

Next, the trial court's Order of Termination found by clear and convincing evidence Bombard abandoned the minor child, and that termination of the biological father's parental rights was in the best interests of the child. The trial court noted during its assessment of abandonment that Bombard paid no child support whatsoever for the support and maintenance of his minor child from September, 1996, until after the filing of the Petition to Terminate Parental Rights in December 1999. Nor did Bombard visit or contact Austin in any way during this period of over three years and three months. Even with full knowledge of the seriousness of the pending action, Bombard failed to pay the child support as ordered. Bombard also gave false and misleading testimony regarding the status of his child support payments, stating under oath these payments were current, when, in reality, certified documents from the Tennessee Child

Support Receipting Unit evidenced an arreage of $2,695.30 as of August 24, 2000. The trial court further determined the inability of DCS to locate Bombard was caused by his own actions, where he left no forwarding address, used several aliases, had no phone listing, and allowed his driver's license to expire in Tennessee.

The trial court was concerned due to Bombard's failure to satisfactorily address the issue of his prior child abuse and follow the recommendations of Luton Mental Health Center regarding additional parenting classes or seek counseling under the Permanency Plan to address his temper and abusive conduct. The trial noted several important considerations raised by expert testimony: Bombard remained a threat to children in his possession; Austin was mentally and emotionally fragile as the result of past abuse, neglect and multiple placements; the Barals had provided the child with a loving and nurturing home; Austin had bonded with the Barals and considered them to be his parents; it would be difficult for Austin to bond again if removed from the possession of the Barals; and such removal would have serious short-term and long-term emotional consequences for the child.

Appellant filed a timely appeal in this matter.

## II. Issues

The following issues are before the court: (A) Whether the trial court erred in finding Bombard abandoned his child; (B) Whether there was sufficient evidence to support a finding that Bombard posed a risk of substantial harm to his child; (C) Whether termination of Bombard's parental rights was in the best interests of the child; (D) Whether the trial court erred by failing to dismiss the Barals' Petition for failure to state a claim upon which relief can be granted; (E) Whether DCS made reasonable efforts to assist the father in finding a suitable home for his child; and (F) Whether third parties can rely upon failure to comply with a plan of care as grounds to terminate a parent's rights to his child?

## III. Analysis

**A.**     **Whether the trial court erred in finding Bombard abandoned his child?**

This case presents the court with another opportunity to examine the delicate interplay involving the rights of natural parents, prospective adoptive parents, and the welfare of a young child. The Tennessee Constitution guarantees the right to privacy. Davis v. Davis, 842 S.W.2d 588 (Tenn. 1992). In light of this right to privacy, the Tennessee Supreme Court declared the state lacks a sufficiently compelling justification to infringe upon the fundamental right of parents to raise their children as they see fit when no substantial harm threatens a child's welfare. Hawk v. Hawk, 855 S.W.2d 573 (Tenn. 1993). Abandonment of the child has been recognized as a situation where a child's welfare is sufficiently threatened to justify state intervention and the termination of parental rights.

The law regarding termination of parental rights is set out in T.C.A. § 36-1-101, *et. seq.* The Juvenile Court has concurrent jurisdiction with Chancery and Circuit Court to terminate

parental rights in a separate proceeding or as part of an adoption proceeding. T.C.A. § 36-1-113. The termination must be based upon a finding by the court by clear and convincing evidence that the grounds for termination have been established and termination is in the best interests of the child. T.C.A. § 36-1-113(c)(1),(2). Abandonment of the child by the parent is one basis for termination of parental rights. T.C.A. § 36-1-102. T.C.A. § 36-1-102(1)(A) defines "abandonment" for purposes of terminating the parental rights of a parent or guardian in order to make that child available for adoption. Abandonment is defined as the parent or guardian's willful failure to visit or willful failure to support or make reasonable payments toward the support of the child for a period of four consecutive months immediately preceding the filing of a pleading to terminate parental rights. "Willfully failed to visit," means the willful failure to visit or engage in more than token visitation. T.C.A. § 36-1-102(1)(E). "Token visitation" means the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child. T.C.A. § 36-1-102(1)(C). "Willfully failed to support or make reasonable payments toward a child's support," means no monetary support was paid or the amount of support paid is token support. T.C.A. § 36-1-102(1)(D). "Token support" means the support, under the circumstances of the individual case, is insignificant given the parent's means. T.C.A. § 36-1-102(1)(B).

Bombard maintains the Barals have failed to show sufficient proof establishing willful and deliberate abandonment of his minor child. The Barals insist the proof established by clear and convincing evidence Bombard abandoned Austin and termination of the father's parental rights was in the best interests of the child.

This Court will first consider the sufficiency of the evidence establishing abandonment of the minor child by Bombard. Six "non-exclusive" factors were suggested for determining whether a parent has abandoned their child in Koivu v. Irwin, 721 S.W.2d 803 (Tenn. Ct. App. 1986). They are: (1) the amount of support given to the child; (2) the degree of contacts and visits with the child; (3) the frequency of gifts on special days; (4) whether custody of the child was voluntarily given over to another; (5) the length of time the child has been away from his natural parents; and (6) the home environment and conduct of the natural parents prior to the removal of the child from their custody. The Court stated, "To determine an abandonment, the Court is not to look at the protestations of affections and intentions expressed by the natural parent, but look at the past course of conduct. This is a judicial question to be determined consistent with the welfare of the child…The ultimate question in an abandonment situation is whether there is clear and convincing evidence of an overall lack of any parental responsibility. Id at 807. Moreover, even where a parent has reestablished contact with a previously abandoned child, the Court may decline to find the abandonment has been terminated. Id at 808. The Court has also noted the abandonment inquiry is heavily fact oriented and the outcome depends upon the facts of each case. Rigsby v. Rigsby, 1994 Tenn. App. LEXIS 46. The Court acknowledged the above factors and remarked no single factor is controlling since their purpose is simply to guide the Court's consideration of the evidence. Id.

These factors shall guide the Court's consideration of Bombard's contact with Austin. The present facts reveal Mr. Bombard was forced out of the residence by DCS approximately five months after Austin's birth after pleading guilty to child abuse inflicted upon another child

in the household. Bombard had no contact with Austin from the end of September 1996 until after he was located by DCS through a due diligence search in June 1999. In assessing the issue of abandonment, the trial court noted Bombard paid no child support whatsoever for the support and maintenance of his minor child from September, 1996, until after December, 1999, a period of over three years and three months.

Bombard maintains his failure to visit or support Austin was not willful as he was unable to locate the child or his mother despite a "diligent" search. The Tennessee Supreme Court considered the element of intent for purposes of abandonment and termination of parental rights analysis in Tennessee Baptist Children's Homes, Inc. v. Swanson (In re Swanson), 2 S.W.3d 180 (Tenn. 1999). The pertinent facts of In re Swanson reveal Harry and Brigette Swanson divorced in 1991. Thereafter, Brigette Swanson moved to various places around Tennessee and Mississippi and refused to allow Harry visitation with their daughter Brittany. Mr. Swanson attempted to maintain contact with his daughter and placed over one-hundred phone calls to his former in-laws over a two-year period in an effort to discover the location of Brittany and her mother. Brittany was placed in the legal custody of the Department of Human Services ("DHS") in May 1993 after the juvenile court made a dependency and neglect determination. Brigette Swanson misrepresented to DHS that Brittany's father was deceased, and the Department modified its goal of reunification with the child's parents to adoption. DHS later received annulment records indicating Harry Swanson was not deceased, yet the Department still made no effort to contact him during the initial proceeding to determine whether Brittany was dependent and neglected. Mr. Swanson learned of the termination proceeding when someone saw the notice published in the newspaper and he appeared in court to contest the allegations of abandonment. Mr. Swanson argued his failure to support his daughter was not willful per T.C.A. § 36-1-102(1)(D) since he was unable to locate his child. Mr. Swanson also challenged the constitutionality of T.C.A. § 36-1-102(1)(D) because the statute created an irrebuttable presumption that a parent's failure to support their children for four months, whether willful or unintentional, results in abandonment.

The Court reviewed the history of the abandonment provisions since its inception in 1951 and stated the definition of "abandonment," as it pertained to failure to support, always contained an element of intent or purposefulness. *Id.* at 187. Yet the Tennessee Legislature excluded the willfulness aspect of failure to support in the definition of abandonment when it amended the adoption code in 1995. The Court refused to conclude the legislature inadvertently or mistakenly omitted the willfulness aspect of failure to support in light of the legislative pronouncement that the only definition of abandonment, which should be applied, is that which is included in the statute, per T.C.A. § 36-1-102(1)(G). *Id.* Consequently, the Court declined to supply the word "willful" and read an element of intent into the definition of "willful failure to support" and proceeded to construe the constitutionality of the statute as drafted. The Court determined the definition is unconstitutional since it creates an irrebuttable presumption that failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional. *Id* at 188. The Court further declared the definition of "willful failure to support" in effect in 1994, which included the element of intent, shall be applied until otherwise amended by the Tennessee Legislature. Finally, the Court concluded Mr. Swanson did not abandon his daughter under the unusual facts of this case.

Yet, in contrast to the facts of In re Swanson, the only proof presented at trial regarding the diligence of Bombard's search reveals he made six phone calls to Marion's parents totaling seven (7) minutes, he mailed two envelopes containing blank pieces of paper to Marion's old address in an attempt to discover a forwarding address, he accidentally encountered Marion's sister where he inquired about her whereabouts only, and then visited a women's shelter where the mother may have recently stayed. These meager efforts to locate the child were token at best. Nor did Marion misrepresent the status or whereabouts of Mr. Bombard to DCS. DCS unsuccessfully attempted to locate Bombard through the mail and searched the Department of Safety's driver's license records during the initial proceeding to determine whether Austin was dependent and neglected. The trial court ultimately concluded DCS was unable to locate Bombard as a result of his use of multiple aliases, failure to provide a forwarding address, absence of a phone listing, and allowing his driver's license to expire in Tennessee. Bombard took no serious steps to be reunited with Austin until after he was contacted by a social worker in the process of terminating his parental rights. The trial court believed Bombard's behavior regarding his search for Austin was consistent with his relationship with his four other minor children from two separate women. Bombard does not know where any of these children live either, but claims to have "diligently" searched for them as well, but been unable to locate them.

It is also undisputed that Bombard failed to pay any child support from the time he was notified of Austin's whereabouts in June 1999 by DCS until after the filing of the Petition to Terminate Parental Rights in December 1999, a period of approximately six months. Even if the Court were to overlook Bombard's failure to support Austin while the child's whereabouts were unknown, the record contains no justification for his failure to support the child after being contacted by DCS in June 1999. Bombard allowed approximately six months to elapse before making a single child support payment. Even with full knowledge of the seriousness of the pending action, Bombard failed to pay the child support as ordered by the court. Bombard gave false and misleading testimony regarding the status of his child support payments, stating under oath these payments were current, when, in reality, certified documents from the Tennessee Child Support Receipting Unit evidenced an arreage of $2,695.30 as of August 24, 2000. Although Bombard was temporarily unemployed during a portion of this time period, the proof presented at trial revealed he paid other debts but failed to pay his child support. These facts indicate Bombard's failure to support his child was willful. Likewise, the record indicates Bombard visited Austin for the first time since September 1996 shortly before the filing of the Petition to Terminate Parental Rights on December 14, 1999. This isolated visit may certainly be considered "token" or perfunctory visitation and merely established minimal or insubstantial contacts with the child. This Court concludes Bombard's failure to appropriately visit or support Austin prior to the filing of the Petition to Terminate Parental Rights is consistent with the trial court's determination of abandonment.

Next, the Court should reflect upon the frequency of gifts on special days. Bombard asserts he sent a Valentine gift in 1999, although it is unclear if the gift was ever received, or by whom, as he was not located by DCS until June 1999. Bombard also sent Austin gifts, cards and emails after he applied for custody until the court ordered no further contact. Thus, Bombard's

gifts to Austin on special days since September 1996 were insignificant. This finding also supports the trial court's determination of abandonment.

The Court should also take into account whether custody of Austin was voluntarily given over to another. Bombard was removed from the home by DCS due to child abuse and lost contact with his child after the mother was evicted from their residence. DCS ultimately concluded Marion's children were dependent and neglected and temporarily placed Austin into foster when unable to locate Bombard. Thus, although Bombard did not affirmatively give custody of Austin to another, these facts suggest Bombard's contact with Austin was disrupted as a consequence of his violent behavior. These facts may also be viewed as consistent with the trial court's ruling regarding abandonment.

Next, the Court should assess the length of time the child has been away from his natural parents. Bombard had no contact with Austin from the time he was removed from the residence in September 1996 until after he was located by DCS in June 1999. The State subsequently filed a Petition alleging Austin and the other children living in Marion's household were dependent and neglected. An emergency protective order temporarily placing the children in the custody of DCS was entered on August 11, 1997. An Order of Adjudication and Disposition was entered on December 19, 1997 whereby Austin and Marion's other children were found to be dependent and neglected, and legal custody was to remain with DCS. Austin was placed in foster care and Marion's other children were placed with their biological father. DCS was unable to locate Bombard at this time. Austin was later placed in the temporary care of his maternal aunt and uncle, Appellees Jocelyn and Michael Baral, in May 1998. Thus, Austin had been separated from his father for nearly three years, and his mother for nearly two years, when Bombard was located by DCS in June 1999. This lengthy period of separation from the child also supports the trial court's determination of abandonment.

Finally, the Court should evaluate the home environment and conduct of the natural parents prior to the removal of the child from their custody. Again, Bombard was removed from the residence in September 1996 by DCS after pleading guilty to child abuse. DCS was also required to remove the children from Marion's care after concluding the children were dependent and neglected. These facts strongly suggest the home environment and conduct of Bombard and Marion were unacceptable prior to the removal of Austin from their custody. These facts are also consistent with a finding of abandonment. This Court concludes the totality of the circumstances support the trial court's determination Bombard abandoned the minor child by clear and convincing evidence.

B.    **Whether there was sufficient evidence to support a finding that Bombard posed a risk of substantial harm to his child?**

Even though the totality of the circumstances provide Bombard abandoned the minor child, a parent's rights may not be terminated unless it is shown the parent is unfit or that substantial harm to the child will result if parental rights are not terminated. *See* In re Swanson at 188. Consequently, Bombard also challenges the sufficiency of the evidence supporting a finding he posed a risk of substantial harm to the child. In defense of this position, Bombard asserts he has never been involved with any child abuse of Austin, he has never been responsible for the severe child abuse of any child, and his current wife does not consider him to be a threat to her children. However, it should be noted the Bond court found the *threat* of substantial harm to the child's welfare was sufficient to justify the state's involvement.

"In light of this right to privacy, we believe that when no substantial harm *threatens* a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit (emphasis added)." Bond, at 548, quoting Hawk v. Hawk, 855 S.W.2d 573, 577 (Tenn. 1993).

Thus, the trial court was appropriately concerned by Bombard's history of child abuse and failure to satisfactorily address his past instances of child abuse or follow the recommendations of Luton Mental Health Center regarding additional parenting classes and counseling to address his temper and abusive conduct. Expert testimony presented to the trial court suggested Austin is a mentally and emotionally fragile as a result of past abuse, neglect and multiple placements. Austin's age would make it difficult for the child to bond again if removed from the possession of the Barals, and such removal would have serious short-term and long-term consequences for the child. This Court concludes these facts are more than sufficient to support a finding that placement of Austin with Bombard posed a risk of substantial harm to the child.

C.    **Whether termination of Bombard's parental rights was in the best interests of the child?**

As the Court concluded the grounds for termination of Bombard's parental rights were established by clear and convincing evidence, and further, that Austin's placement with Bombard posed a risk of substantial harm to the child, we will now consider if termination of Bombard's parental rights was in the best interests of the child. T.C.A. § 36-1-113(c)(2). The trial court questioned Bombard's credibility due to lack of serious effort to locate Austin and his failure to support or visit four additional children whose whereabouts are presently unknown. The trial court also emphasized Bombard failed to comply with the requirements of the Permanency Plan even when he was fully aware his parental rights might be terminated as a result. Bombard failed to satisfactorily address his past instances of child abuse or follow the recommendations of Luton Mental Health Center regarding additional parenting classes and counseling to address his temper and abusive conduct. Expert testimony presented to the trial court suggested Austin is a mentally and emotionally fragile as a result of past abuse, neglect and multiple placements. Austin's age would make it difficult for the child to bond again if removed from the possession of the Barals, and such removal would have serious short-term and long-

term consequences for the child. This Court agrees with the trial court that termination of Bombard's parental rights is in the best interests of the child.

**D.** **Whether the trial court erred by failing to dismiss the Barals' Petition for failure to state a claim upon which relief can be granted?**

The trial court denied Bombard's motion to dismiss or for summary judgment and overruled the father's objection to allowing the Barals to amend their Petition to Terminate Parental Rights. Bombard maintains the Barals failed to allege sufficient grounds upon which relief could be granted in their Petition to Terminate Parental Rights. A review of the Tennessee Rules of Civil Procedure, the Petition, the record and case law evidences this position is without merit. Rule 8.01 of the Tennessee Rules of Civil Procedure provides a pleading is to set forth a claim for relief and shall contain a short and plain statement of the claim showing the pleader is entitled to relief, and a demand for judgment, or relief in the alternative demanded. Bombard argues Rule 8.05 of the Tennessee Rules of Civil Procedure requires a pleading to state all of the facts necessary to constitute a breach of a statutory violation. However, there are no technical forms for pleadings, and Rule 8.05 provides the averment of a pleading shall be simple, concise and direct. Where a pleading states a claim based on a statute, a statement of all the facts necessary to constitute such a breach is to be stated so the other party can be duly apprised of the statutory violation. T.R.C.P. 8.05.

The sole purpose of a motion to dismiss is to test the legal sufficiency of the Complaint. Such motions are not favored and are rarely granted in light of liberal pleading standards. Further, complaints should not be dismissed no matter how poorly drafted, so long as a cause of action is stated. Dobbs v. Guenther, 846 S.W.2d 270 (Tenn. Ct. App. 1992). A motion to dismiss for failure to state a claim for which relief may be granted is determined from examination of the complaint alone, and should not be dismissed unless it appears the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fletcher v. Board of Professional Responsibility, 915 S.W.2d 448 (Tenn. Ct. App. 1995); Sullivant v. Americana Homes, Inc., 605 S.W.2d 246 (Tenn. Ct. App. 1980). When a complaint is challenged, the Court takes the material factual allegations as true and construes the complaint liberally in favor of the plaintiff. Axline v. Kutner, 863 S.W.2d 421 (Tenn. Ct. App. 1993). In ruling on motions for judgment on the pleadings, all well pled allegations of the opposing parties' pleadings are to be taken as true and all allegations of the moving party, which are denied, are to be taken as false. *Id.* A judgment on the pleadings should not be granted unless the moving party is clearly entitled to the judgment. Thus, the issue before the Court is whether, under the facts alleged, the plaintiffs' complaint states a cause of action.

The Barals filed their Petition to Terminate Parental Rights on December 14, 1999. The Petition set forth the names and addresses of the petitioners, the name and address of the respondent, and the fact that legal custody of the minor child was with DCS. Paragraph 7 of the Petition states Bombard had not paid any child support from December 14, 1997 until the most recent court date of November 23, 1999, nor had he visited with the child or made any reasonable efforts to locate the child. That paragraph concludes with the allegation that Bombard had in fact abandoned the child. Paragraph 13 of the Petition specifically states termination of Bombard's parental rights is in the best interests of the minor child. The Barals

stated in paragraph 10 of the Petition Bombard is not a fit custodian for the minor child and represented a substantial danger to Austin due to his lack of responsibility, failure to provide, visit or attend to the needs of his son, and criminal history of child abuse. Paragraph 11 states awarding custody of the minor child to Bombard poses a threat of serious risk of substantial harm to the physical and emotional welfare of the child. Bombard clearly had notice as to the allegations against him and the bases of the Petition for Termination of Parental Rights. The Barals' pleadings comply with Rule 8 of the Tennessee Rules of Civil Procedure. Consequently, this Court concludes the Barals' Petition to Terminate Parental Rights adequately stated a cause upon which relief could be granted. The trial court did not err by failing to dismiss the Barals' Petition for failure to state a claim upon which relief can be granted.

**E.      Whether DCS made reasonable efforts to assist the father in finding a suitable home for his child?**

Bombard's next assignment of error alleges DCS failed to make reasonable efforts to assist him in gaining custody of his son. Fathers have a right to know what happens to their children while in foster care, and to provide a home for them if possible. DCS policy supports this principle, yet the facts in this case indicate Austin entered the DCS system in August 1996 and DCS employees did not locate Bombard until June 1999. Yet, DCS policy or actions do not control the analysis of termination of parental rights. T.C.A. § 36-1-101, *et. seq.* governs the analysis of this issue and clearly provides parental rights may be terminated upon a finding of abandonment. DCS is not responsible for Bombard's failure to appropriately support or visit his son from September 1996 until after the filing of the Barals' Petition. T.C.A. § 36-1-101, *et. seq.* does not contain an exception to termination of parental rights where DCS failed to make reasonable efforts to assist a parent in gaining custody of their child. Nor is Bombard able to cite any Tennessee authority supporting such a position. T.C.A. § 36-1-101, *et. seq.* squarely places the burden on parents to provide their minor children with regular support and visitation or face termination of their parental rights. Bombard is solely responsible for his failure to support or establish a relationship with his child.

Furthermore, a review of the record indicates Bombard's position is without merit. The trial court determined the inability of DCS to locate Bombard during the initial proceeding to determine if Austin was dependent and neglected was caused by his own actions, where he left no forwarding address, used several aliases, had no phone listing, and allowed his driver's license to expire in Tennessee. Bombard took no serious steps to locate his minor child and cannot place the blame for his irresponsibility on DCS. This Court concludes DCS made reasonable efforts to locate Bombard and assist him in finding a suitable home for his child.

**Whether third parties can rely upon failure to comply with a plan of care as grounds to terminate a parent's rights to his child?**

Bombard maintains the Barals, as foster parents, may not "bootstrap" their position to that of the State and rely on the Plan of Care as grounds for termination of parental rights. Bombard argues the rights of foster parents, as set forth in T.C.A. § 37-2-415 and 416, are extremely limited and do not contemplate enforcement of a Plan of Care. Bombard suggests there is nothing in the statute authorizing a private party to use a parent's compliance with a plan of care against the parent. Bombard further argues references to "agency" in T.C.A. § 36-113(g)(2), T.C.A. § 37-2-401 and 402 refer to child welfare entities rather than foster parents. However, a review of the relevant statutory authority reveals Bombard's arguments are misplaced. T.C.A. § 36-1-113(g)(2) provides initiation of termination of parental or guardianship rights may be based upon substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or plan of care pursuant to the provisions of title 37, chapter 2, part 4. This portion of the statute does not make any reference whatsoever to any "agency" other than through a reference to title 37, chapter 2, part 4. Nor does T.C.A. § 37-4-401 contain a reference to any "agency." The final statute cited by Mr. Bombard, T.C.A. § 37-4-402, is the definitional statute and includes a definition of the term "agency." This Court fails to see how the Barals have attempted to "act under color of state law" or "bootstrap" themselves into the position of the State and enforce the Plan of Care. The Barals did not petition the Court to enforce the Plan of Care. The Barals have appropriately referred to Bombard's *actions* in disregard of the plan of care as support for their Petition to Terminate Parental Rights, or in the alternative for custody. Furthermore, the Court considers Bombard's analysis particularly lacking since he overlooks the provision in T.C.A. § 36-1-113(g)(1) declaring initiation of termination of parental rights may be based upon abandonment, the true basis for the Barals' Petition. Enforcement of a Plan of Care is a separate issue from petitioning the Court for termination of parental rights, although analysis of these issues may share reliance on certain facts, such as failure to visit or support the minor child. Thus, this Court concludes Bombard's final assignment of error is without merit.

## IV. Conclusion

This court concludes the trial court's termination of Bombard's parental rights on a finding of abandonment and custody order were proper. For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal shall be assessed to the appellant.

_____
DON R. ASH, S.J.